UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CATHY KENNERSON,

                                Plaintiff,          **No. 10-CV-6591(MAT)**
                                                    **DECISION AND ORDER**

                -vs-

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                                Defendant.

---

## I.    INTRODUCTION

        Cathy Kennerson ("Kennerson" or "Plaintiff"), brings this action pursuant to Title XVI of the Social Security Act, seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). Plaintiff has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rule of Civil Procedure ("Rule 12(c)") seeking to reverse the judgement of the Commissioner and remand for calculation of benefits, or alternatively, for further administrative proceedings.  The Commissioner has opposed the motion and cross-moved for judgment on the pleadings.  For the reasons set forth below, this Court finds that the record as a whole supports a finding that Plaintiff is disabled within the meaning of the Social Security Act ("the Act").  Accordingly, the matter is remanded to the Commissioner for calculation and payment of benefits.

## II.   FACTUAL BACKGROUND

### A.   Overview

Plaintiff's application for Supplemental Security Income ("SSI") benefits, filed on January 15, 2008, alleged impairments of borderline intellectual functioning, a learning disability, depression, dependent personality disorder, and low back pain with an onset date of November 5, 2003. T.136, 232.[1] After her claim was denied on April 24, 2008, T.64-67, Plaintiff filed a written request for a hearing which took place before ALJ Edward Pitts on May 12, 2010. T.10. Plaintiff was represented by counsel, Mark M. McDonald, Esq., who has continued represent her in this proceeding.

In a decision dated May 27, 2010, the ALJ found that Plaintiff was not disabled within the meaning of the Act. T.10-17. The Appeals Council denied Plaintiff's request for review on September 15, 2010, making the ALJ's decision the final decision of the Commissioner. T.1-5. This proceeding followed.

### B.   The Evidence Before the ALJ

#### 1.   Biographical Information and Plaintiff's Testimony

Kennerson was born on April 9, 1983, and was twenty-four years-old on the she filed her SSI claim. Her father was deceased. T.282. Her mother, who is a severe alcoholic and developmentally disabled, is not involved in her life, having previously abandoned Kennerson on several occasions when Kennerson was a minor. T.247-49. At the time of the hearing, Kennerson lived with her

---

[1] Numerals preceded by "T." refer to transcript of the administrative proceeding.

boyfriend and his family. T.41.  Kennerson and her boyfriend have three children together, but the children were removed from Kennerson's care at infancy because she was not able to care for them. T.315.

Kennerson testified that she had been in a special education program since the first grade and at one point, a social worker classified her as mentally retarded. T.309-10. She eventually graduated from high school with an IEP diploma, T.247-49, but was never able to obtain her GED because she could not pass the test. T.27. Apparently, Kennerson had received SSI benefits as a child but lost them because her mother failed to apply for their renewal.  T.303-05.

Between September 2002 and April 2003, Kennerson worked with the State Education Department, Office of Vocational and Educational Services for Individuals with Disabilities ("VESID") between five and twenty hours a week training to be a dishwasher. The VESID reports indicate that her job coach worked with her to learn "all phases of the dish room operation, racking, rinsing, washing pots and pans, dish machine, operation, sorting and stacking clean dishes."  T.177-89.

Between April and May 2003, VESID began teaching Kennerson how to do assembly work. T.191.  In June 2003, she was obtained competitive employment as a parts inspector by Badger Technologies. T.168. However, the pace was too fast and she needed extensive supervision. T.30. She explained that she "didn't really understand what [she] was doing" and that her supervisor had to come help her "almost like an hour every couple hours[.]" T.30. She was laid off

after six months because "she just couldn't handle" the work or the pace of the job. Id. Kennerson stated that this was the longest she had ever held a job. Id. The ALJ agreed that her brief employment at Badger Technologies did not qualify as past relevant work. T.31.

Kennerson testified that she had not worked since 2006 because she has problems completing job applications and dealing with inconsistent job duties. T.31. She also cited back pain and numbness as reasons for not returning to work. Id. She thought she might be able to work if her duties were consistent and not too difficult or stressful. T.31, 52.

With regard to her back pain and numbness, Kennerson stated that she saw a doctor (Dr. Daoud) periodically. T.32. She was prescribed Vicodin for back pain, but she stopped taking it because she did not want to become addicted. T.33. Dr. Daoud prescribed ibuprofen instead. Id. In November 2008, she saw Dr. Daoud after injuring her knee due to slipping on ice. T.33-34. She had seen Dr. Daoud only once or twice since then for her back pain because she lacked transportation. T.34-35. At the time of the hearing, she was looking for a doctor located closer to her home. T.34.

Kennerson testified that she received psychological treatment for a couple of months in 2009, T.37-40, but soon after, she moved out of the county and was no longer eligible for services. T.38-40. She did not seek further treatment due to transportation issues. T.38. Kennerson stated that she has never taken any medications for any psychological conditions. T.40.

Kennerson testified that while at home, she performs chores such as washing dishes and windows, and putting clothes in the dryer. T.41-42. She makes sandwiches for herself and cooks boxed food, but sometimes needs help measuring ingredients. T.42, 50. She goes grocery shopping but always with a person to help her, because she is afraid she of exceeding her food stamp budget. T.42-43. Kennerson stated that she does not do yard work, but is able to sweep the porch. T.43. She has never had a bank account, and has problems counting change. T.50. Kennerson usually stays at home, watching television or playing computer games. Id. She uses the Internet to chat with family, but needs help getting to the correct webpage. T.43-44.

The heaviest things Kennerson can lift are her children, aged two and three years-old, who weigh approximately thirty pounds each. T.46. Because Kennerson felt she could not physically and mentally take care of her children on her own, they currently live with her boyfriend's mother, with whom she shares joint custody. T.46-47, 50. Kennerson testified that she usually has the children on weekends, unless the stress of taking care of them is too much. Tr. 46. She explained that she would sit on the floor and play with them, or watch as they play in the yard. T.47.

Kennerson has never had a driver's license because she could not concentrate enough to study for and pass the test. T.45. Kennerson is reliant upon others for transportation. Id.

Kennerson related that she is sometimes "fidgety" when she sits. T.47. Cold and damp weather bother her legs and back.

T.47-48. On a good day, she can sit for thirty to forty-five minutes, and can stand for an hour to an hour-and-a-half. T.48. On a bad day, she can stand for fifteen minutes. Id. She has tried to exercise by stretching. She testifies that she smokes less than a half a pack of cigarettes per day, and does not drink or use drugs. T.49.

Kennerson explained sometimes she has trouble controlling her temper because of stress, which is usually brought on by money or family issues. T.50 She becomes nervous around people and will try to block them out. T.50. She took public transportation once, but was very frightened by the experience. T.51. In addition, she had difficulty figuring out the bus schedule. T.51.

Kennerson has received benefits from the Department of Social Services ("DSS"). T.53. She testified that DSS employees would pick her up and she would do chores such as washing windows and dusting. T.53-54. DSS credited her for nine hours of work per day, but usually she worked only four or five hours. T.55. She worked with three or four others individuals and got along well with them. T.56. Kennerson was not sure she if could do this work five days per week because of the pain it caused and because of the confusion she experienced as the result of always needing instructions from her supervisor. Id.[2] That is, every time she asked to do another

---

[2]

Kennerson's testimony was wholly consistent with a Function Report completed in March 2008, for the New York State Office of Temporary and Disability Assistance, with regard to her physical, social, cognitive, and work-related limitations.

task, she has to ask someone to explain to her how to accomplish it. T.56.

The Social Security Disability Report ("SSDR") shows that the Department of Social Services pays for Kennerson's and her boyfriend's rent and utilities and gives them cash assistance and food stamps. T.112. A New York State Office of Temporary and Disability Assistance report, dated March 6, 2008, states that Kennerson never had a bank account, does not understand money orders, and will forget things if she does not write them down. The report also indicates that Kennerson does not like to be around people, does not understand them, and becomes stressed when things change unexpectedly. T.148-51.

### 2.   Medical Evidence

A psychological report dated September 16, 1994, from an evaluation performed by the Penn Yan school district psychologist when Plaintiff was eleven and a half years-old indicates that she was classified as mentally retarded by the Seneca Falls school district in the first grade. T.309-10. Upon entering the Penn Yan school district at the end of second grade, she received resource room support in reading, math, and language, as well as special class instruction and speech therapy.

She was assessed again on November 6, 2000, and November 9, 2000, by the Penn Yan school district to determine an appropriate vocational program. At that time, she was in the eleventh grade and had a disability classification of "mentally retarded". Her math level was in third percentile; reading was in the twelfth

percentile; and writing was in the sixth percentile. T.311. Due to her difficulties with reading and comprehending assignments given to her in a class on early childhood education, she was enrolled in the Targeted Jobs Training Program. T.312.

Kennerson underwent a Social Work Evaluation at the Karl D. Warner Clinic which was performed by Patricia Hetrick, MSW, CSW, on May 3, 2002. Hetrick issued the following diagnoses: adjustment disorder (mixed); learning disorder; borderline intellectual functioning; and mild mental retardation. Hetrick observed that Kennerson's mood was mildly depressed with flat affect; she assigned her a GAF (Global Assessment of Functioning) score of 60. T.303. Kennerson denied any depression or suicidal ideation. Hetrick found that Kennerson's borderline intellectual functioning resulted in her being was unable to advocate for herself. Kennerson also needed individual supportive counseling, service coordination, rehabilitative counseling, a supportive work program, and a psychological evaluation to determine eligibility for services. T.305.

Consequently, Kennerson was assessed by psychologist Drew Arnold, Ph.D. at the Karl D. Warner Clinic on May 23, 2002, to determine whether she qualified for services as an individual with mental retardation or other developmental disability. T.247-49. Dr. Arnold based his diagnosis on the "Adaptive Behavior Assessment" system, a record review, and a personal interview. T.247.

Dr. Arnold reported the results of three of Kennerson's previous Wechsler Intelligence Scale IQ tests with verbal IQ (VIQ), performance IQ (PIQ), and full-scale IQ (FSIQ) scores as follows:

        September 2001:    VIQ 83, PIQ 80, FSIQ 80
        September 1994:    VIQ 76, PIQ 71, FSIQ 71
        August 1991:       VIQ 84, PIQ 71, FSIQ 76

T.247. The 1994 test was administered as part of a school psychological evaluation, but the record does not indicate who administered the 1991 and 2001 tests. T.309-10. Id. In 1991 and 1994, the Wechlser test for children was administered; in 2001 and 2002, the Wechlser test for adults was administered. Id.

Dr. Arnold noted that Kennerson was referred for special education when she was in the first grade and, prior to that time, had "experienced significant learning disabilities" which were "functionally consistent with those that would be expected based upon her performance on cognitive measures." T.247.

Dr. Arnold reported that Plaintiff appeared with adequate grooming and hygiene. Although she displayed a moderately elevated level of anxiety, she denied experiencing such symptoms. T.248. According to the Adaptive Behavior Assessment System utilized by Dr. Arnold, Kennerson had a composite score of 82, indicating that she functioned in the low normal to higher borderline range of functioning. T.248. Although she displayed an adequate ability to function independently in the community, she did have marked limits in her ability to access community resources independently. T.248. Her academic skills were not sufficient to allow her to engage in complex legal transactions, such as a signing a lease. She also had

difficulties budgeting and managing her finances. T.249. Although she could perform basic domestic activities, she did not always utilize her skills in an appropriate manner. Id. She was limited in her ability to prepare her own meals and required assistance in meal planning and nutrition. She was able to maintain "most" basic self-care activities. T.249. Dr. Arnold determined that although it was evident she needed help in some areas, her skill deficits did not qualify her for services as an individual with mental retardation. T.249.

On April 21, 2008, Dr. Richard Altmansberger, a state agency psychiatric consultant, conducted a psychiatric review at the request of the Commissioner. Dr. Altmansberger determined that Kennerson suffered from organic mental disorders, namely, borderline intellectual functioning and a learning disability. T.256. He assessed Kennerson as having mild difficulties with daily living activities and social functioning and moderate limitations in understanding, remembering, and carrying out detailed instructions; performing activities on a schedule; responding to changes; setting realistic goals; and making plans independently. T.255-70. Dr. Altmansberger's residual functional capacity assessment indicated that she had moderate limitations in a number of areas, including understanding and remembering detailed instructions and responding appropriately to changes in the workplace. T.268-70. Dr. Altmansberger found that there was "sufficient evidence in the file" indicating that Plaintiff is "able to perform simple work." T.272.

On July 8, 2008, Dr. Richard Hoyt, Ph.D. assessed Kennerson and completed a psychiatric report. Dr. Hoyt observed that she was adequately dressed and groomed and did not display any unusual behavior or delusional thinking. Kennerson presented as passive, with a mildly blunted affect. She was not strongly engaged with her environment. T.282. He reported that Kennerson communicated effectively, except that her memory was vague on details and she had poor ability to perform basic mathematical calculations, even on paper. Dr. Hoyt noted that Kennerson told him that she had trouble learning in school, but she could not remember the nature of her disability. Although she reported that she had previously worked in a factory, Kennerson could not tell Dr. Hoyt what she did there. Kennerson had a reluctance to be around groups of people and became dismayed and confused by noise and multiple interactions. She lacked insight regarding her difficulties in maintaining employment and regarding her own functional limitations. Dr. Hoyt's intelligence testing showed a mild mental retardation in the borderline range. The results of the IQ test Dr. Hoyt administered were as follows: VIQ 73, PIQ 70, FSIQ 70. Two subtests were in the developmentally disabled range. Dr. Hoyt opined that he had 95% confidence that a retest would put her IQ within the same range. T.282-85.

Dr. Hoyt stated that Kennerson could be expected to have difficulty acquiring, retaining, and especially applying information. She could likely follow simple, concrete instructions, but would require close supervision and could not be expected to

exercise independent judgment. She could not manage her own finances, count change, understand paying bills, or ensure her own safety without supervision. As an example, Dr. Hoyt explained that Kennerson would know to call 911 if she saw smoke, but she would not think to investigate if there really was a fire or try to see if there were anything she should do while waiting for the fire department. T.285.

Dr. Hoyt's functional assessment indicated that Kennerson was dependent on her caseworker for transportation and shopping and does not use public transit. He reported that she had problems with judgment in regards to childcare, household maintenance, and money management. He diagnosed a mild affective disorder and a dependent personality disorder.  T.282-85.

Dr. Hoyt stated that Kennerson's overall functional skills were in the dependent range and that she was particularly impaired with respect to exercising independent judgment.  Dr. Hoyt concluded that the combined intelligence testing and the functional assessment results indicated that she was functioning at a developmentally disabled level.  He opined Kennerson could not be expected to maintain competitive employment. T.285.

In January 2009, Kennerson sought treatment from Kelly Behavioral Health for symptoms of depression. She reportedly had been isolating herself, not sleeping, and having daily mood swings. Her stressors included lack of housing and financial difficulties. On January 26, 2009, a Psychosocial-Psychiatric assessment was conducted by Amanda Hackett, a social worker, and approved by

psychiatrist Jennifer Palamara, M.D. Dr. Palamara estimated
Kennerson's intelligence as low average. T. 298-301. In an follow-
up appointment on October 19, 2009, Dr. Palamara diagnosed
Kennerson with depression, a learning disability, and an
unspecified personality disorder.  T.306-07. Her GAF score was
rated at 65 for the prior year (2008) and 55 for the current year
(2009).

### 3.   The ALJ's Decision

On May 27, 2010, the ALJ denied Plaintiff's application for
SSI benefits. T.25.  In making his determination, the ALJ applied
the Social Security Administration's five-step sequential
evaluation process for determining disability.  See 20 C.F.R.
416.920(a).  The ALJ made the following findings:

> (1)   Plaintiff has not engaged in substantial gainful
>       activity during the relevant time period;
>
> (2)   her only severe impairment is a learning
>       disability;
>
> (3)   her impairment does not meet any of the listings in
>       20 C.F.R. Part 404, Subpart P, Appendix 1;
>
> (4)   that despite her impairment, Plaintiff retains the
>       residual functional capacity ("RFC") to perform
>       work at all exertional levels and that she has the
>       ability to (i) understand, carry out, and remember
>       simple instructions and tasks; (ii) interact and
>       respond appropriately to supervision, coworkers,
>       the general public, and usual work situations; and
>       (iii) deal with changes in a routine work setting;
>
> (5)   that she has no past relevant work;
>
> (6)   that Plaintiff is a younger individual as defined
>       by the regulations, has at least a high school
>       education, and can communicate in English; and

> (7) based on Medical Vocational Guideline 204.00, Plaintiff is not disabled.

See T.10-17. On June 9, 2010, Plaintiff requested the Appeals Council review the ALJ's decision, which was denied September 15, 2010, thereby rendering the ALJ's decision the final decision of the Commissioner. T.1-5.

## III. JURISDICTION AND SCOPE OF REVIEW

Title 42 U.S.C., § 405(g) grants the district courts jurisdiction over claims based on the denial of Social Security benefits. When considering these cases, the court must accept the findings of fact made by the Commissioner, provided that such findings are supported by "substantial evidence" in the record. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Metropolitan Stevedore Co. v. Rambo, 521 U.S. 121, 149 (1997) (quotation omitted). In reviewing claims under the Act, the Court must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). Review by the district court is limited to determining whether the Commissioner's findings were supported by substantial record evidence and whether the Commissioner employed the proper legal standards. Green-Younger v. Barnhard, 335 F.3d 99, 105-06 (2d Cir. 2003).

Judgment on the pleadings may be granted under Fed. R. Civ. P. 12(c) "where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the

pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988) (citation omitted).

## IV.  DISCUSSION

In her appeal to this Court, Plaintiff argues that the ALJ failed to identify all of Plaintiff's severe impairments at step two (Point I of Plaintiff's Memorandum of Law ("Pl. Mem.")); failed to perform the "special technique" required when the claimant has a mental impairment (Pl. Mem, Point I); erred with respect to the application of Listing 12.05C (Pl. Mem., Point II); improperly performed the residual functional capacity assessment (Pl. Mem., Point III); failed to call a vocational expert (Pl. Mem., Point IV); and improperly assessed Plaintiff's credibility (Pl. Mem., Point V).

As discussed below, the Court finds that the ALJ erred in his determination regarding Listing 12.05(C). The Court further finds that there is substantial evidence in the record to support a finding that Plaintiff meets the requirements of Listing 12.05(C) and therefore is disabled. The Court has determined that remand with for calculation of and payment of benefits is the proper remedy. See Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980)(stating that where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the proper remedy is remand solely for

calculation of benefits); <u>accord</u> <u>Carroll v. Secretary of Health &</u> <u>Human Servs.</u>, 705 F.2d 638, 644 (2d Cir. 1983).

The remainder of the arguments forth by Plaintiff, if successful, would result in a remand for development of the record and a new hearing. Since the Court is remanding for a calculation of benefits based upon Plaintiff's argument concerning Listing 12.05(C), the Court need not address Plaintiff's remaining contentions in detail.

**A.  The ALJ's finding that Plaintiff does not satisfy listing 12.05C contains errors of law and is not supported by substantial evidence.**

According to Listing 12.05C, a claimant must demonstrate significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifesting during the developmental period, i.e., before age twenty-two. Since the record showed Plaintiff demonstrated "some sub-average general intellectual functioning" and "some deficits in adaptive functioning which manifested while she was a child" (e.g., the special education services she received since attending first grade, T.247-49), the ALJ examined the requirements of Listing 12.05C.[3]

**1.  Listing 12.05(C): The IQ Score Requirement**

Listing 12.05(C) is part of the listing dealing with mental retardation in adults.  To meet Listing 12.05(C), a claimant must

---

[3]

Plaintiff does not argue that she meets any of the requirements of paragraphs A, B, or D of Listing 12.05.

satisfy the diagnostic description in the introductory paragraph of 12.05, and both prongs of section (C). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). Thus, meeting Listing 12.05(C) necessitates (1) an IQ score between 60 and 70 and (2) a physical or other mental additional impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.05, 12.05(C).

The regulations provide that when separate verbal, performance, and full-scale IQ scores are provided, the "lowest should be used in conjunction with 12.05." 20 C.F.R. § 404 App. 1, 12.00(D)(6)(c). When there are multiple IQ tests, the lowest IQ score should be used unless there is some indication that the score is invalid. See Davis v. Astrue, 7:06-CV-00657 (LEK), 2010 WL 2925357, at *5 (N.D.N.Y. July 21, 2010) ("Although there is no definite rule on the issue of how to reconcile multiple IQ results, courts tend to prefer the lowest IQ score across multiple, valid tests.") (citing Coogan v. Astrue, No. 08–1387, 2009 U.S. Dist. LEXIS 15678, at *6 n. 2, 2009 WL 512442 (D. N.J. Feb. 27, 2009) (stating that it is not the ALJ's task to decide which IQ score he prefers as Listing 12.05(C) requires only one valid score in the applicable range); Ray v. Chater, 934 F. Supp. 347, 350 (N.D. Cal. 1996) (opining that the regulations prefer the lowest score amongst multiple tests)).

The ALJ here concluded that Plaintiff's "IQ scores, combined with her high levels of adaptive functioning, are generally too

high to meet the requirements" of Listing 12.05(C). T.13. In particular, the ALJ determined that "there is no conclusive IQ testing that demonstrates that the claimant has a valid IQ *below* 70." T.13 (emphasis supplied). This was error, since a claimant need not have an IQ below 70 in order to satisfy the first prong of Listing 12.05(C).

The ALJ also discounted, without justification, the intelligence testing performed by Dr. Hoyt in 2002 which resulted in performance and full-scale IQ scores of 70, both of which satisfy the first requirement of Listing 12.05(C). The ALJ found that the full score IQ 70 was not consistent with prior testing, T.13. However, Plaintiff also had a performance IQ of 70 obtained in 2002, which could qualify for the first part of Listing 12.05(C). The previous tests show that Plaintiff scored a PIQ of 71 in 1991, a PIQ of 71 in 1994, and a PIQ of 80 in 2001. T.247, 283. Apart from the sole test score of 80 in 2001, the other performance IQ tests scores were consistent with each other, including the one from 2002. In addition, they were consistent with Dr. Hoyt's prediction that if retested, there was a 95% probability that her IQ would fall within the 67-75 range. T.285. Where three of the four test scores are 70 or 71, the "outlier" in this set of data instead appears to be the IQ score of 80 obtained in 2001. In short, the ALJ failed to adduce adequate justification for rejecting the more recent testing by Dr. Hoyt in favor of results

that were seven, fourteen, and seventeen years older.[4] See <u>Ferraris</u> <u>v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984) (stating that the ALJ must set forth "the crucial factors in any determination . . . with sufficient specificity to enable [the court] to decide whether the determination is supported by substantial evidence") (internal citations omitted).

The ALJ also was not justified in discounting Dr. Hoyt's opinion and giving greater weight to Dr. Arnold's opinion based upon Dr. Arnold's "expertise". As Plaintiff points out, the record indicates that both are licensed psychologists and, therefore, have similar levels of expertise. Moreover, if additional weight were to be accorded to one, it arguably should have been to Dr. Hoyt, given that he administered an IQ test himself. Dr. Arnold did not administer an IQ test and instead applied the "Adaptive Behavior Assessment" system. Dr. Arnold did not explain how his adaptive behavior score related to the Wechsler IQ test, which the Social Security regulations describe as "essential to the adjudication of" claim such as Plaintiff's under Listing 12.05(C). See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(b), (C).

Further error occurred in the ALJ's rejection of Dr. Hoyt's test results as "inconsistent with the longitudinal medical

---

[4]
The record indicates that the September 1994 test (71 for both full scale and performance; 76 for verbal) was administered by School Psychologists at Penn Yan Central Schools. T.309-10. That report was signed by Amy Bolger, School Psychology Intern, and approved by Nancy Jameson, School Psychologist. The source of the 1991 and 2001 tests are not part of the record.

evidence in the record", T.16. If the ALJ finds an IQ score to be invalid because it is inconsistent with evidence in the record, he should explain the basis for his decision. <u>Davis v. Astrue</u>, 2010 U.S. Dist. LEXIS 73225, at *17;  2010 WL 2925357, at *5 (N.D.N.Y. 2010) (citations omitted). Here, apart from the ALJ's conclusory statement cited above, there is no explication of his reasons for finding inconsistency between Dr. Hoyt's test results and the remainder of the record. It bears noting that both Dr. Hoyt and Dr. Arnold made very similar findings concerning Plaintiff's deficits in adaptive functioning. <u>Compare</u> T.247-40 (Dr. Arnold's report) <u>with</u> T.284-85 (Dr. Hoyt's report). This is not a case where, for instance, the test administrator has called into question the results or accused the claimant of malingering. Indeed, the Court cannot discern any basis in the record or in the ALJ's decision for rejecting Dr. Hoyt's test results out of hand. Therefore, the Court determines that Plaintiff is entitled to use the lowest score from test Dr. Hoyt administered (either a performance or a full scale IQ score of 70) to meet the first requirement of Listing 12.05(C).

### 2.   Listing 12.05(C): Other Severe Impairment

The second part of Listing 12.05C requires that the claimant have a "physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. § 404 App. 1, 12.05. A number of circuit courts have disputed the proper test for evaluating whether a claimant's impairment imposes "an  additional  and  significant  work-related  limitation  of

function," but the Second Circuit has not ruled on this issue. MacMillan v. Astrue, No. 1:07-CV-0959 (LEK/VEB), 2009 WL 4807311, at *7 (N.D.N.Y. Dec. 7, 2009) (citing Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997) (adopting the severity test utilized at step two of the sequential evaluation) with Flowers v. United States Dep't of Health & Human Servs., 904 F.2d 211, 214 (4th Cir. 1990) (requiring claimant to be unable to perform his or her prior work to show the required additional and significant limitation)).

Revisions to paragraph 12.00(A) have clarified the "additional limitation" requirement of Listing 12.05(C), and now direct an ALJ to "assess the degree of functional limitation the additional impairment[ ] imposes to determine if it significantly limits [the claimant's] physical or mental ability to do basic work activities, i.e., is a 'severe' impairment[ ], as defined in §§ 404.1520(c) and 416.920(c)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(A); see also MacMillan, 2009 WL 4807311, at *7 (citation omitted). The Act's regulations thus provide that the proper test for evaluating an impairment, apart from a claimant's low IQ, for purposes of Listing 12.05(C), is the same test used at step two of the sequential evaluation to determine whether an impairment is 'severe.'" MacMillan, 2009 WL 4807311, at *7 (citing 20 C.F.R. §§ 404.1520(c), 416.920(c); Baneky v. Apfel, 997 F. Supp. 543, 546 (S.D.N.Y. 1998) ("This Court holds that the correct standard for determining whether an 'additional' impairment imposes a

"significant" work-related limitation under section 12.05(c) is the severity test . . . .").

In the context of a step two severity determination, basic work activities include the ability to understand, carry out, and remember simple instructions; use judgment; respond to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting.   20 C.F.R. § 416.921; SSR 85-28, 1985 WL 56856 (S.S.A.), at *3. The Second Circuit has emphasized that step two is limited to ruling out *de minimis* claims.   Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). If the impairment's symptoms cause "a limitation or restriction having more than a minimal effect on an individual's ability to do basic work activities, the adjudicator must find that the impairment[ ] is severe." SSR 96-3P, 1996 WL 374181 (S.S.A.), at *2.

The ALJ found that Plaintiff did not have any other severe impairment besides her learning disability, which he presumed was the cause of her low IQ.  See T.13 (noting that Plaintiff's full scale IQ of 70 was not consistent with prior testing although it showed that she has "a significant learning disability"). The ALJ, in finding that Plaintiff's learning disability was a severe impairment, relied on the report of Dr. Palamara, which does not contain any indication as to the cause of Plaintiff's learning disability. T.307. The remainder of the record contains no medical opinion to support the ALJ's assumption that Plaintiff's learning

disability is solely a function of her low IQ for purposes of meeting the mental retardation listing in 12.05(C).

"It is plain that mental retardation is different from a learning disorder." Williams v. Astrue, 07CIV4134JGK, 2008 WL 4755348, at *10 (S.D.N.Y. Oct. 27, 2008). In connection with Listing 112.05(C), the childhood analog of Listing 12.05(C), the Commissioner has explained that "mental retardation requires both significantly subaverage general intellectual functioning and deficits in adaptive functioning." Id. (citing Childhood Disability Evaluation Issues, Social Security Administration Office of Disability, SSA Pub. No. 64-076 (March 1998)). A learning disability is an impairment in its own right, distinct from mental retardation, and the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR") has separate diagnoses for Learning Disorder and Mental Retardation. Id. at 41, 56. It stands to reason that a learning disorder can exist even in the presence of a primary diagnosis of mental retardation, and thus may satisfy the second prong of §12.05(C). See id. (citing DSM-IV-TR at 49 n.10 ("A diagnosis of LD . . . can serve as an additional and significant impairment under Listings 112.05D and F."). In addition, a learning disorder is a separate impairment from borderline intellectual functioning. Williams, 2008 WL 4755348, at *10.

Here, Plaintiff's learning disability and below-average intelligence/borderline intellectual functioning were diagnosed

separately by different doctors, and the ALJ was not justified in grouping Plaintiff's intellectual impairment with her learning disability. The ALJ is not a medical expert and cannot assume that separate diagnoses referred to the same impairment. See Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) ("In the absence of a medical opinion to support the ALJ's finding as to Balsamo's ability to perform sedentary work, it is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. . . .'") (quotation omitted); see also Goldthrite v. Astrue, 535 F. Supp. 2d 329, 339 (W.D.N.Y. 2008) ("An ALJ must rely on the medical findings contained within the record and cannot make his own diagnosis without substantial medical evidence to support his opinion."). Indeed, the Commissioner's own consultant, Dr. Altmansberger, gave separate diagnoses of a learning disorder and borderline intellectual functioning, T.256, as did Dr. Palamara. In overlooking this, the ALJ failed to give proper weight to the findings of Dr. Altmansberger as a disability analyst retained by the COmmissioner. See 20 C.F.r. § 416.927(f)(2)(i) ("[A]dministrative law judges must consider findings of state agency medical and psychological consultants or other program physicians or psychologists as opinion evidence. . . .").

Dr. Altmansberger determined that Plaintiff had "moderate limitations" in the following areas: understanding and remembering detailed instructions; carrying out detailed instructions; performing activities within a schedule; maintaining regular

attendance and being punctual within limits customarily tolerated in the workplace; and setting realistic goals or making plans independently of others. T.268-70. Dr. Altmansberger reported that she would have moderate difficulty the following areas: maintaining concentration, persistence, and pace; understanding, remembering, and carrying out detailed instructions; performing activities in a schedule; responding to changes; setting realistic goals; or making plans independently. T.255-70. Although Dr. Altmansberger found that Kennerson did not have significant limitations in certain areas, the ALJ failed to explain how Kennerson's numerous moderate limitations, which affect virtually all of the skills and aptitudes required to obtain and maintain substantial gainful employment, had no more than a minimal effect on her ability to perform basic work activities. See 20 C.F.R. § 404.1521 ("An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to basic work activities."); 20 C.F.R. § 404.1521(b) (stating that basic work activities are the abilities and aptitudes necessary to do most jobs).

The ALJ failed to accord appropriate weight to the opinion of Dr. Hoyt, who performed an extensive review of Plaintff and administered IQ tests. As the result of her IQ scores, Dr. Hoyt ranked Plaintiff in the range of "mild mental retardation to borderline". Consistently with Dr. Altmansberger, Dr. Hoyt stated that Plaintiff cannot exercise independent judgment; cannot

remember details; has poor ability to perform calculations even on paper; and can be expected to have difficulty acquiring, retaining, and, in particular, applying information. T.284. Dr. Hoyt opined that the combined intelligence testing and functional assessment were indicative of functioning at a developmentally disabled level. T.282-85.

Dr. Hoyt's assessment is not inconsistent with that of Dr. Arnold, who stated that Plaintiff could not be expected to answer complex questions or those requiring sophisticated or up-to-date information. Dr. Arnold determined that Plaintiff's adaptive composite score was in the low normal to higher borderline range, consistent with her intellectual ability. T.247-49. The remaining medical evidence is consistent with Dr. Arnold's and Dr. Hoyt's opinions. In particular, Dr. Palamara estimated Plaintiff's intelligence to be in the low-average range. T.300-01.

The medical evidence overwhelmingly supports that Plaintiff had borderline intellectual functioning, which, in itself, is considered to be a severe impairment typically requiring the testimony of a vocational expert to determine its effect on employability. See Cangelosi v. Chater, No. 94-CV-2694, 1996 WL 663161, *7 (E.D.N.Y. Nov. 5, 1996) (in determining the claimant's ability to work, the ALJ should have also considered the effect of his low I.Q. scores because "[a] claimant's borderline I.Q. is 'a severe impairment causing nonexertional limitations'") (quoting Lee v. Shalala, 872 F. Supp. 1166, 1170 (E.D.N.Y. 1994) (citing

Cunningham v. Heckler, 895 F.2d 492, 496 (8th Cir. 1990) (stating that a claimant who alleges an I.Q. between 70 and 79 has "alleged a severe impairment and may be considered disabled after consideration of vocational factors")).

Moreover, there is substantial medical evidence in the record to support a finding that Kennerson has additional severe impairments apart from her low IQ and learning disability. Although the ALJ characterizes the Dr. Palamara's report as diagnosing Kennerson only with a learning disorder (Axis II), Dr. Palamara also included an Axis I diagnosis of depression, NOS (not otherwise specified), and an Axis II diagnosis of personality disorder). T.300. This was consistent with Dr. Hoyt's previous diagnosis of a dependent personality disorder,[5] and observations by several

---

[5] The Diagnostic and Statistical Manual of Mental Disorders, 4th Edition Text Revision (DSM-IV-TR), defines dependent personality disorder as a pervasive and excessive need to be taken care of that leads to submissive and clinging behavior and fears of separation, present in a wide variety of contexts and present by early adulthood. At least five of the following criteria should be present for a diagnosis of dependent personality disorder: difficulty making decisions, even minor ones, without guidance and reassurance from others; requiring others to take responsibility for major decisions and responsibilities beyond what would be age-appropriate; difficulty disagreeing with others due to an unreasonable fear of alienation; unable to initiate or complete projects or tasks due to a belief that he or she is either inept or that the appearance of success would lead a support person(s) to abandon him or her; takes on unreasonably unpleasant tasks or sacrifices things in order to win the approval of others; unable to spend time alone due to a lack of self-reliance and an unreasonable fear of being unable to care for oneself; inability to remain independent of a close relationship as manifested by seeking a substitute support relationship immediately after one ends; unrealistic preoccupation with the thought of being left to care for oneself.

providers, including Dr. Arnold, that Plaintiff suffered from anxiety and depression.

Dr. Hoyt reported that Plaintiff does not use public transportation and was dependent on her caseworker for transportation and for assistance shopping. Reports of her social functioning indicated that she has an aversion to being around people and gets confused by multiple interactions. Dr. Hoyt opined that Plaintiff would require close supervision and that Plaintiff's overall functional skills were in the dependent range. T.282-85. Dr. Palamara similarly diagnosed a personality disorder, and there is no basis for concluding that it was a different diagnosis than the "dependent personality disorder" diagnosed by Dr. Hoyt, especially since Dr. Palamara's review was performed subsequently to that performed by Dr. Hoyt and was less extensive.

With regard to her depression, anxiety, and dependent personality disorder, ALJ did not find these afflictions to be severe essentially based upon her lack of treatment and the fact she does not take psychotropic medication and has never been hospitalized. T.12. The Second Circuit has noted that a claimant's refusal or inability to obtain treatment for a mental illness is not necessarily probative of the severity of the individual's disability. DeLeon v. Secretary of Health and Human Servs., 734 F.2d 930, 934 (2d Cir. 1984); see also Day v. Astrue, No. 07 Civ. 157(RJD), 2008 WL 63285, at *5 n. 7 (E.D.N.Y. Jan. 3, 2008) (A "'lack of treatment [should not be used] to reject mental

complaints both because mental illness is notoriously underreported and because it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'") (quoting <u>Regennitter v. Commissioner of Soc. Sec. Admin.</u>, 166 F.3d 1294, 1299-1300 (9th Cir. 1999) (further quotation omitted); <u>accord</u> <u>Clark v. Astrue</u>, 2010 WL 3036489, at *5, 2010 U.S. Dis. LEXIS 78479, at *14-15 (S.D.N.Y. 2010).

Moreover, a ruling issued by the Commissioner provides that an "adjudicator must not draw any inferences about an individual's symptoms and functional effects from a failure to seek out or pursue medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 SSR LEXIS 4, at *22 (S.S.A.). Here, the record indicates Plaintiff's attempts to continue with mental health treatment were frustrated by her lack of insurance coverage and the unavailability of transportation. T.282 (noting that she stopped attending counseling because her sister was no longer available to drive her); T.284 ("Dependent upon case worker for transportation, help shopping. Does not use pubic transportation."). In addition, the ALJ failed to take into account Plaintiff's borderline intellectual functioning and lack of insight into her own limitations, which were likely contributors in her failure to continue mental health treatment. <u>See</u> T.283 (noting that Plaintiff "demonstrated lack of insight maintaining employment

and her own functional limitations). Although the psychological evaluations indicated that Plaintiff was suffering from depression and anxiety, she sometimes denied experiencing such symptoms. See, e.g., T.248 (Dr. Arnold noted that she "displayed a moderately elevated level of manifest anxiety but denied experiencing symptoms of anxiety or anxiety based disorder").

Relatedly, the ALJ erred in stating that Dr. Palamara assigned a GAF of 65 (which he felt indicated only "mild symptoms") to Plaintiff in January 2009. T.12-13. That GAF score was for the year prior to the intake report on which it was noted (i.e., the report dated January 14, 2009). T.300. Kennerson's GAF in January 2009, by contrast, was 55, see T.300, which indicates moderately severe limitations. See DSM-IV-TR at 34.

An ALJ is required to find that an impairment is severe if the symptoms cause a limitation or restriction having more than a minimal effect on the individual's ability to perform basic work activities. This is so, even if the objective medical evidence would not, standing alone, establish that the impairment is severe. SSR 96-3p, 1996 SSR LEXIS 10, at *5-6 (S.S.A.). The ALJ erred in failing to find that Plaintiff's depression and anxiety, dependent personality disorder, and borderline intellectual functioning also were severe impairments insofar as they individually and cumulatively impose more than slight limitations on her ability to perform basic work activities within the meaning of 20 C.F.R. § 416.920(a). Therefore, Plaintiff has satisfied the second condition

of Listing 12.05(C).  Accordingly, this Court finds that Plaintiff meets the requirements of Listing 12.05(C) and is disabled.

**B.   The ALJ erred in failing to apply the Special Technique.**

As noted above, because this Court reverses on the listings, the Plaintiff's remaining arguments do not need to be addressed. The Court, however, briefly notes in this section and Section IV.C. two additional errors that affected the proceedings.

In addition to the five-step analysis outlined in 20 C.F.R. § 404.1520, there are regulations governing an ALJ's evaluation of the severity of mental impairments. 20 C.F.R. § 404.1520a. These regulations require application of a "special technique" at the second and third steps of the five-step framework. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. §§ 404.1520a(a), 416.920a(a). This technique "requires a reviewing authority to determine first whether the claimant has a 'medically determinable mental impairment.'" Id. at 265–66 (quoting 20 C.F.R. § 404.1520a(b)(1)). "If the claimant is found to have such an impairment, the reviewing authority must 'rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c),' . . . which specifies four broad functional areas." Id. at 266 (quoting 20 C.F.R. § 404.1520a(b)(2)). These areas are as follows: "(1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation." Id.

(citing 20 C.F.R. § 404.1520a(c)(3)), see also 20 C.F.R §
416.920a(c)(3).

The regulations also require that the application of the
special technique be documented. Kohler, 546 F.3d at 266 (citing 20
C.F.R. § 404.1520a(e)). The ALJ's written decision must "reflect
application of the technique, and . . . 'include a specific finding
as to the degree of limitation in each of the [four] functional
areas.'" Id. (quoting 20 C.F.R. § 404.1520a(e)(2)).

Kohler distinguishes between discussing the relevant evidence
in the context of the claimant's residual functional capacity, and
applying it to the four functional areas set forth in the "special
technique". 546 F.3d at 268. Unless the ALJ has performed the
latter analysis, he or she has not adequately considered the entire
record when determining the severity of the claimant's impairments.
Id. In other words, the ALJ is required to "make specific findings
regarding the claimant's degree of limitation in each functional
area; it is not sufficient to discuss the limitations in the
context of the claimant's residual functional capacity." Moore v.
Astrue, Civil No. 3:10-CV-0709 (CFD)(TPS), 2010 WL 4976756, at *3
(D. Conn. Dec. 2, 2010) (citing Kohler, 546 F.3d at 268).

In her memorandum, Plaintiff uses the term "special
psychiatric review technique",[6] but based on the law cited to by
Plaintiff, the Court assumes Plaintiff was in fact arguing a

---

[6]
    Typically, a medical or psychological consultant will complete a
standard document, known as a "Psychiatric Review Technique Form"
("PRTF"). Id.

failure to properly apply the special technique. See Reinhardt v. Astrue, 2009 WL 6315326, at *5 n.6   (N.D.N.Y. Dec. 30, 2009) ("Plaintiff uses the term 'psychiatric review technique.' Based on the law cited to by Plaintiff, the Court assumes Plaintiff was in fact arguing a failure to properly apply the special technique analysis.") (citation omitted).  The Commissioner did not respond to this specific argument.

Here, as Plaintiff points out, although the ALJ did find that Plaintiff has a severe mental impairment, i.e., a learning disability, it does not appear that the ALJ employed the special technique at the second and third steps of the five-step sequential evaluation, as required by 20 C.F.R. § 404.1520a(c). See Booker v. Astrue, No. 1:07-cv-646 (GLS), 2011 WL 3735808, at *3 (N.D.N.Y. Aug. 24, 2011) ("Because the learning disability falls under the rubric of mental impairments, the ALJ was required to employ the special technique required in the evaluation of such impairments.") (citation omitted). Courts have held that the failure to apply the special technique is not harmless error, as the Commissioner may be suggesting in his failure to respond to Kennerson's argument. See Moore, 2010 WL 4976756, at *3 (rejecting as without merit Commissioner's argument that because plaintiff made it past the step two screening step, the ALJ's failure to utilize the special technique was not particularly significant).

**C.   The ALJ erred in assessing Residual Functional Capacity and erroneously relied exclusively on the Medical Vocational Guidelines.**

The Court also agrees with Plaintiff that the ALJ's finding of Plaintiff's Residual Functional Capacity ("RFC") and his reliance on the Medical Vocational Guidelines (the "Grids") were in error.

At step four, the ALJ must make specific findings regarding a claimaint's work-related abilities and must consider both the exertional and non-exertional limitations created by the claimaint's impairments. Antonetti v. Barnhart, 399 F. Supp. 2d 199, 204 (W.D.N.Y. 2005). Because the Grids only consider the physical, or exertional, levels required for different types of work, use of the Grids is inappropriate where the claimant has physical or mental impairments that are not related to physical strength. 20 C.F.R. § 404 App. 2, 200.00(e). Where, as here, the claimant has non-exertional limitations that significantly affect her work-related abilities, the ALJ cannot meet the Commissioner's burden in step five by relying on the Grids. Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986). Instead, the ALJ must introduce the testimony of a vocational expert ("VE") or other similar evidence to show that a job exists in the national economy that the claimant can obtain and is capable of performing. Id.

In his RFC determination, the ALJ found that the Plaintiff could "perform a full range of work at all exertional levels" and that she was "capable of sustaining unskilled routine work with limited social contact." T.14-16. The ALJ then relied on the Grids to make his ultimate finding of no disability. T.16-17. The ALJ made no specific findings with regard to Plaintiff's work-related

capabilities and limitations despite the overwhelming evidence in the record that she does in fact have non-exertional limitations. An ALJ cannot ignore a claimant's non-exertional limitations and then make a non-disability determination based upon the Grids. See Antonetti, 399 F. Supp.2d at 204 ("The ALJ found that plaintiff did not suffer from any significant non-exertional impairments that would preclude reliance on the Guidelines. In fact, [the] vocational expert . . . testified that if plaintiff's mental impairments created difficulties with plaintiff maintaining concentration or making decisions, it would have a 'negative impact' on plaintiff's ability to keep a job."). To meet the Commissioner's burden, the ALJ was required to make specific findings of Plaintiff's non-exertional limitations and then consult a VE or obtain similar testimony. His failure to do so here was error.

### C.   Summary

When making a determination of disability, the ALJ and a reviewing court must examine the entire record and consider the whole person. See 20 C.F.R. § 404.1523 (providing that consider the combined effect of all of the claimant's impairments must be evaluated, without regard to whether any such impairment, if considered separately, would be of sufficient severity). Plaintiff presents as a wishful young woman who does not understand the extent of her own limitations. She wants to have her own apartment and live independently, but she is dependent on others for

transportation, shopping, and her own safety. T.282-84, 304.  She would like to have a job but requires one that provides almost constant supervision and does not vary from day-to-day. T.52, 284. She has expressed an interest in working in childcare, but her own children were removed from her home because she was unable to care for them. T.247, 298. After reviewing the record in its entirety, the Court concludes that contrary to the ALJ's decision, the substantial evidence supports a finding that Plaintiff suffers from a number of severe mental impairments and adaptive deficits that, in concert with her low IQ, place her within the parameters of Listing 12.05(C). Therefore, the Court finds, Kennerson suffers from a disability within the meaning of the Act.

## V.   ORDERS

Plaintiff's motion for judgment on the pleadings is granted. The Commissioner's motion for judgment on the pleadings is denied. Plaintiff's claim is remanded to the Commissioner for calculation and payment of benefits.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
Honorable Michael A. Telesca
United States District Judge

DATED:     Rochester, New York
           August 3, 2012